The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ford and the briefs and arguments before the Full Commission as well as the new deposition testimony of Laura Gentry and of Regina Wiles. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. A North Carolina Industrial Commission Form 21 Settlement Agreement dated June 17, 1996 is admitted into evidence.
2. On May 14, 1996, the parties were bound by and subject to the North Carolina Workers Compensation Act.
3. On that date an employer-employee relationship existed between the parties.
4. As of that date, defendant was a duly qualified self-insurer under the provisions of the North Carolina Workers Compensation Act.
5. Plaintiff sustained an injury by accident arising out of and in the course of the employment with defendant on May 14, 1996.
6. On the injury date plaintiff was earning an average weekly wage of $239.12 yielding a compensation rate of $159.42.
7. The parties further stipulate into evidence that plaintiff has been paid compensation through August 13, 1996 and plaintiff is claiming no compensation prior to said date, that plaintiff began work for defendant October 3, 1995 and last performed work duties for defendant May 14, 1996 with the exception of the 4 days from June 18, 1996 through 21, 1996, and that defendant was allowed to cease payment of compensation by Order of the Executive Secretary dated September 25, 1996.
At the hearing before the Deputy Commissioner on January 14, 1999, the parties introduced the following exhibits:
1. Defendants Exhibit 1, marked D1, consisting of records concerning plaintiffs employment dating from 1995 to June 1996.
Subsequent to the hearing before the Deputy Commissioner on January 14, 1999, the parties entered the following documents into the record, that have been considered by the Full Commission in ruling in this matter and with respect to which all Motions and Objections have been duly considered under the applicable law and rules of evidence:
 1. Deposition of David L. Kelly, Jr., M.D. dated April 6, 1999.
2. Deposition of Thomas Craig Derian, M.D. dated March 22, 1999.
3. Deposition of John L. Bond, Jr., M.D. dated March 18, 1999.
4. Deposition of Laura Gentry dated August 2, 2000.
5. Deposition of Regina Wiles dated September 14, 2000.
 ***********
Based upon all of the competent evidence in the record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On May 14, 1996, plaintiff, thirty years of age with a high school education and special training with children in the Outreach Program, was employed by defendant as a parent-teacher in the Smart Start Outreach-Parents As Teachers program. Plaintiffs job duties in this position involved visiting family homes and working with children.
2. On May 14, 1996 as plaintiff was moving a two-drawer file cabinet in the performance of her work duties, she sustained an injury by accident arising out of and in the course of her employment with defendant resulting in pain to her low back radiating to her left upper extremity. She had acute lumbar strain with considerable spasm. She also complained of pain in her left arm and shoulder. She suffered a disk herniation at L5-S1 with a resulting pinched nerve.
3. Defendant accepted compensability for plaintiffs back injury through a Form 21 Agreement, approved by the Industrial Commission on August 26, 1996. The Form 21 required payment of the compensation rate for "necessary weeks and became binding on the parties upon approval by the Industrial Commission.
4. Plaintiff underwent treatment for her injuries the day after the accident with Dr. John L. Bond, Jr., MD, and returned for continuing treatment on May 20 (5 days later), May 23 when she was complaining of increasing pain in the lower lumbar area, and the examination showed rather marked limited motion on anterior flexion with tenderness over the mid spine, L5-S1 area, and the sacroiliac areas bilaterally, June 5 when she still had a fair amount of muscle spasm along the left lumbar area, but she had no pains in her legs at that time, and June 17 when she still had pain in the lumbar area. Dr. Bond had kept her out of work all of this time.
5. On June 14, Laura Gentry, executive director of the Wilkes Community Partnership for Children, who was plaintiffs supervisor, wrote her a letter saying,
 "As we discussed on the phone (June 14, 1996), it is critical to our Outreach program that your home visiting records are up-to-date.
 On June 24, 1996, I will meet with you to look over your records and assess the status of your records and employment.
 As we discussed, we will do whatever we can to make you comfortable. There will be no additional driving, to what you are already driving to therapy, and we can set up a mat in Kris office if you need to lie down. You will be able to walk around, sit, or lie down as needed. You can come and go as you are able with no time limitations. The only work we will be asking you to do is to update your files so that your records are in compliance. If writing becomes difficult, I will assign someone for you to dictate to.
6. Based upon the alleged "critical need for plaintiff to get her home visiting records up to date and the implied threat of firing ("assess the status of your records and employment), Dr. Bond reluctantly on June 17, 1996 released her to work on her records an hour or so per day under strict limitations, saying, "I feel that she could work two to three hours per day at least until she gets her records caught up."
 Q. Now, are you aware, in fact, that she did return to work the following day, June 18, 1996?"
 A. I think that in our discussions at that time there was discussion regarding the fact that she needs to get her records up-to-date, and I had agreed that she should try to do what she could to get her records straight — her records straightened out, and that was the reason that I agreed to her going back to work.
7. During her limited record straightening from June 18, 1996 through June 21, 1996 plaintiffs pain continued unmitigated and Dr. Bond again took her out of work, on June 27, 1996. He told her on July 22, 1996 she could return to light duty under restrictions but by that time she had been fired by defendant. The return to work on June 18, 1996 was a failed return to work. She continued treatment with Dr. Bond intermittently as required from then through October 3, 1996 when he discontinued treatment after referring her to Dr. David L. Kelly, Jr., head of the neurosurgery department at Wake Forest University Medical Center.
8. Plaintiff did not return to work on June 22, 1996 due to the illness of her minor son. She gave defendant notice that she would not be able to return to work during the illness of her son because nobody else was available to care for him. She told defendant that she would be out of work approximately 2 weeks, or until her son recovered.
9. On July 1, 1996 plaintiffs supervisor wrote her a letter stating, in part:"
 On May 24, you received a letter stating that you were on probation until June 7th, 1996 and needed to get your files up-to-date. Due to your back injury and being out on leave, we recognized that you were unable to update your files by June 7th. On June 18th you returned for work on a part-time basis with a physicians release, and were able to work for 2-3-hours a day. On June 21st you told your supervisor that you had updated the files that were out of compliance and were finished with the files."
 On June 24 we had planned to meet with you to discuss your probationary status. On that day (June 24) you called in sick with your son who had bronchitis. Since we were unable to meet with you in person, you are receiving written notification that your employment at Wilkes County Schools as an Outreach Worker is terminated immediately for the following reasons:
The reasons given were alleged falsification of records, violation of home visiting contract and missing mandatory team meetings.
10. Defendant filed a Form 24, Request To Terminate Benefits, which was approved by the Industrial Commission on September 25, 1996, effective June 18, 1996. Temporary total disability was paid at the rate of $159.42 per week from May 15, 1996 through August 13, 1996. The Full Commission finds that the approval of the Form 24 by the special deputy commissioner (which was subject to review by a Deputy Commissioner and the Full Commission) was in error and it is hereby vacated. The failed return to work at a make-work job is not evidence of wage earning capacity and the firing of plaintiff from that make-work job, which she could rightly have refused to do, is not a constructive refusal to work. The presumption of continuing disability until plaintiff is able to return to work at the same or greater wages than she was earning on the day of injury has not been rebutted on the record of this case.
11. On this record the only evidence that plaintiff was on notice that her job performance might be unsatisfactory was given to her after her compensable injury. On this record no person other than plaintiff has been fired by the Outreach program without attendance at a job counseling session during which the employee is allowed to rebut any alleged job shortcomings and is allowed to make amends. Laura Gentry testified that plaintiff also violated a policy requiring an employee to call in and report why they are not able to be at work. There is no evidence in this record that this policy was violated. In fact, the record contains a fax in which Laura Gentry was told that plaintiff called in on June 24, 1996 and June 25, 1996 to explain her absence (taking care of a sick child) and was told it would be approximately two weeks before she could return, or until her child recovered. Thus her dismissal letter of July 1, 1996 was issued at a time when defendant was on continuing notice that plaintiff would be out of work attending to a sick child.
12. On October 21, 1996, plaintiff filed a Form 28U with the Industrial Commission, requesting a reinstatement of workers compensation benefits. On or about April 25, 1997, plaintiff filed a Form 33, Request For Hearing, requesting reinstatement of disability benefits as a result of her Form 28U, to which the defendant responded through a Form 33R. Deputy Commissioner Ford held the January 14, 1999 hearing as a result.
13. Dr. Bond said he had no knowledge that plaintiff had a herniated disk and saw no need for surgery. However, the only diagnostic aid he used in examining her back was an x-ray and he admitted that x-rays only show bone problems and will not reveal disk problems. Dr. Kelly ordered a CAT scan and upon reviewing the results was of the opinion that plaintiff was not in need of surgery. He reported the results of the CAT scan and released plaintiff from his care on November 4, 1996.
14. Having been released from care by Dr. Bond and by Dr. Kelly, plaintiff presented to Dr. Thomas Craig Derian, an orthopedic surgeon, on February 6, 1997, some 8-1/2 months after the compensable injury, complaining of continuing low back, left buttock and left lower extremity pain and numbness resulting from the compensatory injury. Dr. Derians initial impression was that she had chronic low back and left lower extremity pain and that she may have a disk rupture or spinal stenosis or degeneration of the disk. He ordered an MRI and an EMG nerve conduction velocity test. The MRI was conducted on March 24, 1997, and it revealed moderately severe disk degeneration with a posterior annular tear, or a tear in the back of the disk, at L5-S1. Dr. Derian rendered the opinion, and the Full Commission finds as fact, that the disk rupture had been caused by the compensable injury and that the previous x-ray by Dr. Bond and CAT scan by Dr. Kelly had been inadequate to diagnose the problem which had been there all along.
15. Plaintiff returned to Dr. Derian on April 21, 1997. At that time he felt it was very unlikely that plaintiff would improve without surgical intervention and he felt that she was disabled from work. The nature of a surgical decompression, stabilization and fusion was discussed, risks and possible complications, and plaintiff was to consider her options and return for a discussion, which she did on May 5, 1997. On that day plaintiff reported she was having significant pain with the most minor activities of daily living and she requested to proceed with surgery, which was to consist of decompression, stabilization and fusion at L5-S1.
16. Various problems with her children, family and sickness postponed the surgery until it was performed on September 8, 1998. Dr. Derians treatment and surgery was necessary to effect a cure and to provide relief with the hope of returning plaintiff to wage-earning capacity. The surgery revealed a physical tear in the back of the disk resulting in protrusion of the inner two-thirds of the disk through this tear resulting in compression of a nerve. Based upon the mistaken assumption that plaintiff had rejected surgery, on June 26, 1997, Dr. Derian had mistakenly found that plaintiff was at maximum medical improvement with a 15% disability rating for her back. He later recanted that finding. Other suspicions of drug-seeking activity on the part of the plaintiff and the feeling that plaintiff was mischaracterizing her symptoms for purposes of secondary gain were also successfully refuted.
17. Plaintiff felt the surgery was not entirely successful. As of the March 22, 1999 deposition of Dr. Derian, plaintiff had not been released from his care, had not reached MMI, and was still disabled from working.
18. As of May 24, 2000, the date of the hearing before the Deputy Commissioner and continuing to the March 15, 2001 filing of defendants supplementary brief, no physician had indicated that plaintiff was capable of returning to work without significant restrictions and at her pre-injury wage.
19. Mention in the record that plaintiff may have helped her husband in his business at one time or another is not evidence of wage-earning capacity.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reaches the following additional:
 CONCLUSIONS OF LAW
1. On May 14, 1996, plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant resulting in disk herniation at L5-S1 and loss of wage-earning capacity.
2. The Form 21 for "necessary weeks became an award of temporary total disability when approved by the Industrial Commission and created a presumption of continuing disability. Initially, the employee must prove both the extent and degree of his disability, but once the disability is proven, there is a presumption that it continues until the employee returns to work at wages equal to those he was receiving at the time his injury occurred. However, the approval of a Form 21 agreement by the Industrial Commission relieves the employee of his initial burden of proving a disability, and the employee receives the benefit of a presumption that he is totally disabled. Franklin v. Broyhill Furniture,123 N.C. App. 200, 472 S.E.2d 382 (1996).
3. To rebut the presumption of continuing disability arising from a Form 21 agreement, the employer must produce evidence that (1) suitable jobs are available for the employee; (2) the employee is capable of getting said job taking into account the employees physical and vocational limitations; and (3) the job would enable the employee to earn some wages. The employer may also rebut the presumption of disability by showing that the employee has unjustifiably refused suitable employment. Brown v. S N Communications, 124 N.C. App. 320, 477 S.E.2d 197
(1996).
4. Under the Workers Compensation Act, disability is defined by a diminished capacity to earn wages, not by physical infirmity. N.C.G.S.97-2(9) (1991). However, the fact that an employee is capable of performing employment tendered by the employer is not, as a matter of law, an indication of plaintiffs ability to earn wages. Peoples v. Cone Mills Corp., 316 N.C. 426, 434, 342 S.E.2d 798, 804 (1986). As the Supreme Court has previously stated:"
 If the proffered employment does not accurately reflect the persons ability to compete with others for wages, it cannot be considered evidence of earning capacity. Proffered employment would not accurately reflect earning capacity if other employers would not hire the employee with the employees limitations at a comparable wage level. The same is true if the proffered employment is so modified because of the employees limitations that it is not ordinarily available in the competitive job market. The rationale behind the competitive measure of earning capacity is apparent. If an employee has no ability to earn wages competitively, the employee will be left with no income should the employees job be terminated.Id. at 438, 342 S.E.2d at 806.
The Court went on to conclude that,"
 The Workers Compensation Act does not permit [defendant] to avoid its duty to pay compensation by offering an injured employee employment which the employee under normally prevailing market conditions could find nowhere else and which [defendant] could terminate at will or, as noted above, for reasons beyond its control. Id.
5. The job offered plaintiff of completing her reports for one or two hours a day under conditions that would not be available to any other worker at any other job in the economy is not a suitable job and plaintiffs refusal to continue doing that job is not constructive refusal to work. (We will do whatever we can to make you comfortable There will be no additional driving. we can set up a mat in Kris office if you need to lie down You will be able to walk around, sit, or lie down as needed. You can come and go as you are able with no time limitations. The only work we will be asking you to do is to update your files so that your records are in compliance. If writing becomes difficult, I will assign someone for you to dictate to.) Defendant has offered plaintiff no other job since defendant fired her on July 1, 1996.
6. Defendant failed to prove that any other employee would have been fired under the conditions under which plaintiff was fired. "If an injured employee refuses employment procured for him suitable to his capacity he shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Industrial Commission such refusal was justified. N.C. Gen. Stat. 97-32." To establish that an employee has constructively refused employment, the employer must show that the employee was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee would ordinarily have been terminated. Seagraves v. Austin Co. Of Greensboro, 123 N.C. App. 228, 472 S.E.2d 587 (1996).
7. Plaintiff is entitled to continuing temporary total disability from August 14, 1996, through January 14, 1999, at the rate of $159.42 per week and continuing until the Form 21 presumption of continuing disability is rebutted.
8. Plaintiff is entitled to medical care for her compensable injuries. N.C. Gen. Stat. 97-25 as limited by N.C. Gen. Stat. 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation in the amount of $159.42 per week from August 14, 1996, through January 14, 1999 and continuing until the Form 21 presumption of continuing disability is rebutted or until further order of the Industrial Commission. Defendant may take credit for the pay to plaintiff for the hours "worked during the failed return to work attempt of June 18, 1996 through June 21, 1996. As much of the compensation that has accrued to the date of payment shall be paid in a lump sum, subject to interest and attorneys fees as set forth below.
2. Defendant shall pay for all medical care for plaintiffs compensable injuries, including but not limited to that furnished by Dr. John L. Bond, Jr., Dr. David L. Kelly, Jr., and Dr. Thomas Craig Derian.
3. Defendant shall pay interest at the rate of 8 percent per year on the compensation payable, from the date of the hearing before the Deputy Commissioner until paid.
4. Defendant shall pay directly to plaintiffs attorney 25% of the lump sum otherwise payable to plaintiff and thereafter shall pay every fourth check directly to plaintiffs attorney.
5. Defendants shall pay the costs.
This 23rd day of March 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER